IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIEL PHILPOT, | : | CIVIL ACTION |
|       Plaintiff, | : | |
| | : | |
|   v. | : | |
| | : | |
| AMTRAK,[1] | : | |
|       Defendant. | : | NO. 10-1276 |
| | : | |

**MEMORANDUM RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**Baylson, J.**                                                                                       **November 3, 2011**

**I.     Introduction**

Plaintiff Daniel Philpot ("Philpot"), an African-American male, brought this action against his former employer, Defendant National Railroad Passenger Corp. ("Amtrak"), alleging that his termination from Amtrak was the result of racial discrimination and unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 et seq.  Amtrak moves for summary judgment pursuant to Fed. R. Civ. P. 56(c).  For the following reasons, Amtrak's Motion is GRANTED.

**II.    Factual Background**

The following facts are undisputed[2] or reflect Philpot's version of facts in the record,

---

[1] Defendant asserts that Plaintiff's Complaint improperly identifies Defendant as "Amtrak," when in fact it should be identified as "National Railroad Passenger Corp."  Def. Br. at 1.

[2] The parties each submitted statements of material undisputed facts ("Pl. MUF" and "Def. MUF") for purposes of this Motion and responded to their opponent's statements of material undisputed facts.  Statements which an opposing party "disputed" were deemed undisputed for purposes of this Motion if the party's explanation of the dispute was non-responsive or failed to reference supporting evidence in the record.  See Fed. R. Civ. P. 56(c), (e).

pursuant to this Court's duty to view all facts and inferences in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

On August 14, 2008, Philpot was employed by Amtrak as a board usher at 30th Street Station in Philadelphia, Pennsylvania. Def. MUF and Pl. MUF ¶ 3.[3] As a board usher, Philpot's responsibilities included finding out if Amtrak trains would be arriving at 30th Street Station on time and updating the information posted in the train station regarding trains' arrival times. Id. ¶ 6. Like all employees, Philpot was subject to Amtrak's "Standards of Excellence," a manual that explains Amtrak's goals, values, and expectations.[4] Id. ¶¶ 10-11. Philpot admits that he had previously received a copy of Amtrak's "Standards of Excellence" and was aware of his obligations under it when the events prompting this action took place. Id. ¶ 12.

Prior to August 14, 2008, Philpot's employment with Amtrak had been terminated on two occasions, once in August 2005 for improper use of an Amtrak voucher and once in October

---

[3] This citation format indicates that both Defendant's and Plaintiff's Material Undisputed Facts reflect the stated information at the specified paragraph.

[4] The Standards of Excellence provide, in relevant part:

**Teamwork**
Being polite to each other is one of the basics of teamwork, so it is important that we all are considerate and respectful of each other. Part of teamwork is properly performing your duties. Another part is following instructions. Therefore, you must comply with all company and department policies, procedures and rules as well as all instructions, directions and orders from supervisors and managers.

**Conduct**
On the Amtrak team, there is no place for activities or behaviors that compromise the safety, satisfaction and well-being of our customers, the public or our fellow employees. Therefore, boisterous conduct such as fighting, rudeness, assault, intimidation, horseplay and using profane or vulgar language is unacceptable. It is important to remain calm and be courteous to all customers even those who may be difficult at times.

Exh. C of Def. Br. at 8. They further provide: "*You should understand that failure to follow the standards of excellence outlined in this booklet—as well as the rules specific to your particular job—will result in appropriate corrective or disciplinary action up to and including dismissal.*" Id. at 4 (emphasis in original).

2005 for insubordination (that is, failure to follow a supervisor's direct orders). Id. ¶¶ 48-49. After the October 2005 termination, Philpot made a claim of racial discrimination against Amtrak. Def. Br. at 9-10; Pl. Br. at Part III.C.1.[5]  After both of these terminations, Philpot was reinstated based on "last chance" agreements that provided he would have no further opportunity to remain employed if he failed in his responsibilities. Id. ¶¶ 49-50; Exh. L and Exh. M of Def. Br.

On the date in question, August 14, 2008, Philpot arrived for work at 5:45 a.m. for a shift that began at 6:00 a.m. Id. ¶ 15.  Philpot did not find any available parking spots in the area close to 30th Street Station. Additional employee parking areas were located further from 30th Street Station, but Philpot chose not to look for parking in those areas. Id.  Instead, Philpot chose to park in a supervisor-only designated parking area, despite being prohibited from doing so. Id. ¶ 16.

Philpot entered the station and asked another employee, Jeff Banks ("Banks"), to notify him when his shift ended at 7:00 a.m., so that Philpot could move his car into Banks' parking spot upon Banks' departure. Id. ¶ 17.  At 7:00 a.m., Philpot followed Banks out of the station and attempted to move his car into Banks' parking spot. Id. ¶ 18.  According to Philpot, he was occupying "the majority" of the parking space previously occupied by Banks when he felt his car get bumped from behind by another vehicle. Pl. MUF ¶ 19; Exh. A of Pl. Br. at 56:1-10.  Philpot emerged from his car and confronted the other driver, another Amtrak employee named Blake

---

[5] Although the parties do not dispute that Philpot made a claim of racial discrimination in connection with his October 2005 dismissal, neither party provides citations to the record that shed light on the specific nature of this claim. The only relevant portion of the record cited by a party is an ambiguous portion of Philpot's deposition testimony; the testimony seems to suggest that Philpot's claim was lodged with the Equal Employment Opportunity Commission and/or the Pennsylvania Human Relations Commission. See Exh. A of Def. Br. at 8:25-12:14,

Owings ("Owings"). Owings is Caucasian. Pl. MUF ¶ 53; Exh. E of Def. Br. Philpot and Owings began to argue about the parking spot and the collision. Def. MUF ¶ 22; Pl. MUF ¶¶ 19, 22.

Amtrak Police Officer Gerald Arntz ("Officer Arntz") responded to a report of the dispute between Philpot and Owings. Officer Arntz was part of the Police Department's K-9 Unit and was accompanied by a trained police dog. Def. MUF and Pl. MUF ¶ 20. Philpot and Officer Arntz had known each other for a period of 5-7 years and had a friendly relationship. Id. ¶ 21.

Upon his arrival at the scene, Officer Arntz observed Philpot and Owings arguing. He instructed both Philpot and Owings to move their cars to the Penn Coach Yard. Id. ¶ 22. Initially, Philpot's vehicle was blocked by Owings' vehicle; as a result, Philpot could not move his car. Pl. MUF ¶ 22. In response to Officer Arntz's order, however, Owings returned to his car and drove it away. Def. MUF ¶ 23; Pl. MUF ¶¶ 22-24. At this time, Philpot did not remove his car but rather declined to follow the officer's order "so that [he] could return to his desk to maintain his duties." Pl. MUF ¶ 24.

Prior to Philpot's leaving the parking area, Officer Arntz warned him that if he left his car parked improperly, Officer Arntz would have it towed away. Philpot responded, "Go ahead and tow it." Pl. MUF ¶¶ 27-28; Pl. Exh. A at 118:21. Several minutes later, Philpot returned to the parking area. Officer Arntz was standing by Philpot's car, preparing a traffic citation and arranging for a tow truck to tow Philpot's car. Def. MUF and Pl. MUF ¶ 29.

Philpot moved toward Officer Arntz and put his arms out to his sides in frustration. Def. MUF ¶ 30; Exh. A of Def. Br. at 71:10-11; Pl. MUF ¶ 30. Officer Arntz instructed Philpot to walk away, but Philpot continued to approach. Officer Arntz warned Philpot that "[t]he dog is

in attack mode," and Philpot responded, "Well, if that dog bites me, I'm going to bite him back." Def. MUF and Pl. MUF ¶¶ 30-31; Exh. A. of Def. Br. at 71:13-17.  Philpot continued to move toward Officer Arntz until Officer Arntz pushed him away with an upraised hand.  Def. MUF and Pl. MUF ¶ 32.  At that moment, Officer Arntz decided to charge Philpot with disorderly conduct, although Philpot was not issued a citation until later that day.  Def. MUF and Pl. MUF ¶ 33.

In defiance of Officer Arntz's instructions to move away from the area, Philpot got into his car and pulled fully into the disputed parking space.  He then exited the car and returned to the station.  Def. MUF and Pl. MUF ¶ 34; Exh. A. 71:18-72:7.

Officer Arntz, now joined by a Sergeant John Cullinan ("Sergeant Cullinan"), approached Philpot at his work location inside of the station.  Sergeant Cullinan requested that Philpot present his driver's license, but Philpot refused.  Def. MUF and Pl. MUF ¶ 35.  Sergeant Cullinan repeated the request three more times, and Philpot refused to comply each time.  Id.

Officer Arntz and Sergeant Cullinan approached Richard Gadbois ("Gadbois"), Amtrak's Assistant Superintendent of Stations, and informed Gadbois that Philpot was refusing to comply with their orders.  Id. ¶ 36.  Gadbois then instructed Philpot to produce his driver's license to Sergeant Cullinan, which Philpot ultimately did.  Id.

Philpot asked Sergeant Cullinan why the police needed his driver's license.  Id. ¶ 37.  The Sergeant replied that it was because Philpot had been "disorderly."  Def. MUF and Pl. MUF ¶ 37; Exh. A of Def. Br. at 104:6.  After this exchange, Philpot stated: "This is the most racist thing I've ever seen you guys do."  Def. MUF and Pl. MUF ¶ 38.  In response, Gadbois told Philpot that racial comments of that sort were not permitted on Amtrak property.  Def. MUF and Pl. MUF ¶ 117; Exh. K of Pl. Br.; Exh. B of Pl. Br. at 151:6-7.

5

The police then issued Philpot a citation for disorderly conduct,[6] a traffic citation for failure to comply with a police officer directing traffic, a traffic citation for failure to produce his driver's license upon demand, and a parking violation for not properly parking his vehicle. Def. MUF and Pl. MUF ¶ 40-42. In addition, Officer Arntz informed Gadbois of the day's previous events, including that Philpot had ignored police requests to move his car from a disputed parking space, that Philpot had acted defiantly and angrily toward police, that Philpot had invaded his physical space, and that Philpot had refused to follow orders to produce his license. Def. MUF and Pl. MUF ¶ 43.

Gadbois decided to place Philpot out of service and Philpot left the property without further incident. Def. MUF and Pl. MUF ¶ 45; Exh. F of Def. Br; Pl. Br. at Part II. Gadbois subsequently filled out a Discipline Assessment Worksheet in which he recommended to Amtrak that Philpot be dismissed from employment based on his behavior on August 14, 2008 and on his disciplinary history. Def. MUF and Pl. MUF ¶ 67; Exh. S of Def. Br.

At all times relevant to this action, Philpot was a member of the Transportation Communications International Union, AFL-CIO, District 1351 (the "Union"). Def. MUF and Pl.

---

[6] Philpot was eventually arrested in connection with the disorderly conduct charge and entered a plea of nolo contendere, see Exh. I of Pl. Br.; Exh. 2 of Def. Reply Br. at 87:5-89:21. The Court does not rely on evidence of this plea in assessing the nature of Philpot's conduct on August 14, 2008, because "in Pennsylvania a nolo plea does not constitute an admission of factual guilt, and thus has no evidentiary value in assessing whether the defendant committed a crime." United States v. Poellnitz, 372 F.3d 562, 567-70 (3d Cir. 2004) (applying this legal principle to hold that a federal district court's evidentiary ruling was improper).
   Notwithstanding this limitation, however, the fact of the plea conclusively rebuts Philpot's suggestion that the disorderly conduct charge was simply "withdrawn at trial, presumably due to lack of evidence." See Pl. MUF ¶ 39; see also Poellnitz, 372 F.3d at 568 ("[T]he Pennsylvania evidence code draws a distinction between the permissible use of a nolo plea to prove the fact of conviction and the impermissible use of a nolo plea as evidence of guilt in a subsequent proceeding."); Philpot's Letter of October 28, 2011 ("Plaintiff does not object to the admissibility of Plaintiff's nolo contendere plea regarding the charge of disorderly conduct."); Audio File, Coutroom_3A_10-26-2011, at 12:00-15:30 (discussing the possible appropriate uses for evidence of the nolo plea).

MUF ¶¶ 2, 61.  Accordingly, his employment was governed by a collective bargaining agreement that entitled him to a hearing regarding the misconduct alleged against him.  Def. MUF and Pl. MUF at ¶ 62.  At that hearing, Philpot was represented by a Union representative and was permitted to put on witness testimony and evidence.  Def. MUF and Pl. MUF at ¶¶ 62-65.  After reviewing the evidence, the Hearing Officer ("O'Connell") found that Philpot had violated Amtrak's Standards of Excellence by his conduct on August 14, 2008.  Id. ¶¶ 63-66.

After learning the outcome of the hearing and reviewing Gadbois' Discipline Assessment Worksheet, the General Superintendent for Amtrak's Mid-Atlantic Division ("Alleman") issued a decision dismissing Philpot from employment.  Id. ¶ 69.  The decision was sent to Philpot and was accompanied by a letter from O'Connell notifying Philpot that O'Connell had found that the misconduct charges had been proven.  Id. ¶ 70.

Philpot was entitled to, and did, appeal O'Connell's determination of his guilt to Amtrak's Director of Labor Relations ("Oratokhai"), which appeal was denied based on the extensive evidence about Philpot's actions on August 14, 2008 and based on his disciplinary history.  Id. ¶¶ 72-73.

Finally, Philpot appealed his dismissal to the Special Board of Adjustment, which provides review of employment decisions by a panel comprised of an Amtrak representative, a union representative, and a third-party representative.  The Board affirmed the dismissal, stating that "in all aspects of this case, the Carrier [Amtrak] has proved guilt."  Id. ¶¶ 74-76.

**III. Procedural History in this Court**

On March 26, 2010, Philpot, proceeding pro se, filed a complaint alleging that he was terminated in violation of Title VII and the PHRA.  (ECF No. 3.)  Discovery ensued.

In January of 2011, Philpot obtained counsel. On February 28, 2011, Amtrak filed a Motion for Summary Judgment. (ECF No. 23.) In light of Philpot's recent retention of counsel, the Court re-opened discovery and Amtrak's Motion was considered re-filed as of July 31, 2011. On August 1, 2011, Amtrak was permitted to submit a supplemental brief in support of its Motion (ECF No. 31), and on August 19, 2011, Philpot submitted a response to the Motion (ECF No. 33). Amtrak timely replied. (ECF No. 38).

Philpot's response brief of August 19, 2011 did not contain appropriate record evidence as required by Fed. R. Civ. P. 56(e); accordingly, on August 22, 2011, Philpot requested leave to substitute his original response brief with one that included exhibits (ECF No. 34). That request is hereby GRANTED and the substituted brief filed with Philpot's Motion is considered timely submitted for purposes of the Court's review of this Motion for Summary Judgment.

On September 26, 2011, the Court held oral argument regarding Amtrak's Motion. See Audio File, Coutroom_3A_10-26-2011, ECF No. 47. At the conclusion of argument, the Court invited Philpot to submit a supplemental letter brief discussing any additional Supreme Court or Third Circuit cases that might support his response to Amtrak's Motion. Philpot submitted a supplemental letter on October 28, 2011, and Amtrak responded on October 31, 2011.

**IV.    Jurisdiction**

This Court has jurisdiction over Plaintiff's federal statutory claim pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's state-law claim pursuant to 28 U.S.C. § 1367(a).

**V.    Standard of Review**

A district court should grant a motion for summary judgment if the movant can show

"that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[7]  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id.

Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by showing the district court that "there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The party opposing summary judgment must rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.  The district court may grant summary judgment "[i]f the evidence is merely colorable, or is not significantly probative." Anderson, 477 U.S. at 249 (internal citations omitted).  Under Rule 56, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in favor of the non-movant. Id. at 255 (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970)).

---

[7] Because this civil action was pending when the Amendments to the Federal Rules of Civil Procedure became effective on December 1, 2010, the Court references the amended summary judgment standard in Fed. R. Civ. P. 56(a), which substitutes "genuine dispute" for "genuine issue," the phrase in former subdivision (c).  The Rules Advisory Committee explained that the 2010 Amendments do not affect the substantive standard for summary judgment or the applicability of prior decisions construing the standard.  Fed. R. Civ. P. 56 Advisory Committee's Note.  Pursuant to 28 U.S.C. § 2074(a) and the April 28, 2010 Supreme Court order, the amended rule governs all proceedings commenced on or after December 1, 2010, and all proceedings then pending, "insofar as just and practicable." United States Courts, Rules and Forms in Effect: Rules and Forms Amendments Effective 12/1/10, http://www.uscourts.gov/RulesAndPolicies/FederalRulemaking/Overview/RulesForms120110.aspx (last visited Apr. 5, 2011).

**VI.     Discussion**

   **A. Racial Discrimination in Violation of Title VII and the PHRA**

   Under both Title VII and the PHRA, a plaintiff must come forward with enough evidence to establish a prima facie case of discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Scheidemantle v. Slippery Rock Univ. State, 470 F.3d 535, 539 (3d Cir. 2006) (applying McDonnell Douglas framework to a claim of discrimination under the PHRA). If the plaintiff succeeds in establishing his prima facie case, the burden shifts back to the employer to establish a legitimate, non-discriminatory reason for its action. Atkinson v. LaFayette College, 460 F.3d 447, 454 (3d Cir. 2006). Upon the employer's satisfaction of this standard, the burden shifts again to the plaintiff to prove that the non-discriminatory explanation is merely a pretext for discrimination. Id.

   Amtrak argues that Philpot can neither make out a prima facie case of discrimination nor demonstrate that Amtrak's non-discriminatory rationale for his dismissal was merely pretextual. To set out a prima facie case of racial discrimination, Philpot must show that: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) similarly situated employees not of the protected class received more favorable treatment or the circumstances of the termination otherwise give rise to an inference of unlawful discrimination. McDonnell Douglas Corp., 411 U.S. at 802. Amtrak contends that Philpot has failed to satisfy the fourth prong—specifically, Amtrak rejects Philpot's claim that Blake Owings was "similarly situated" to him and was treated more favorably insofar as Owings was not disciplined for his role in the events of August 14, 2008.

   Amtrak claims Blake Owings was not "similarly situated" to Philpot for several reasons.

First, as Philpot admitted in his deposition testimony, Owings complied with Officer Arntz's order to move his car, whereas Philpot did not comply. See Exh. A. of Def. Br. at 128:10-19. Amtrak also emphasizes that there is no evidence in the record that Owings invaded Officer Arntz's physical space, as Philpot did, or refused police orders to produce his license, as Philpot did. Furthermore, the disciplinary records of Owings and Philpot are distinguishable, in that Owings' past incidents of misconduct never resulted in his dismissal, whereas both of Philpot's past incidents resulted in dismissals. Exh. F of Pl. Br. at 19-24; Audio File, Courtroom_3A_ 10-26-2011. Finally, Philpot was employed on August 14, 2008 pursuant to a "last chance" agreement, whereas Owings was not employed pursuant to a similar agreement on the date in question. Id. ¶ 50; Exh. F of Pl. Br. at 19-24.[8]

To be "similarly situated" for purposes of workplace disciplinary actions, comparator employees "must be 'similarly situated' in all relevant aspects." Wilcher v. Postmaster Gen., 2011 WL 3468322, at *2 (3d Cir. Aug. 9, 2011) (citing Russell v. Univ. of Toledo, 537 F.3d 596 (6th Cir. 2008); Lee v. Kansas City S. Ry. Co., 574 F.3d 253, 259-261 (5th Cir. 2009)). Important factors include such things as the degree of similarity in "the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." Id. Put differently, the Court must examine whether the employees "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." McCullers v. Napolitano, 427 Fed. App'x 190, 195 (3d Cir. 2011) (quoting Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir.

---

[8] At oral argument, the parties disputed whether Owings had two or three past incidents of disciplinary misconduct. Audio File, Courtroom_3A_10-26-2011, at 1:30-3:30. Owings' deposition testimony—the only relevant evidence in the record—is ambiguous on this point. Exh. F of Pl. Br. at 19-24. However, the parties agree that none of Owings' two or three past incidents resulted in his dismissal from service.

11

2000)).

In her brief and at oral argument, Philpot's counsel countered Amtrak's assertions by arguing that Philpot and Owings were "similarly situated" because both were subject to Amtrak's Standards of Excellence, both had disciplinary problems in their past, and both were involved in the parking dispute that took place on August 14, 2008.  Pl. Br. at Part III.B.1; Audio File, Courtroom_3A_10-26-2011, at 1:00-2:00.  A careful examination reveals these purported similarities to be without merit.  The first similarity is not enough to qualify the men as comparators in light of the surrounding circumstances—indeed, all employees at Amtrak are subject to the same Standards of Excellence, yet no court would conclude from this alone that all employees of Amtrak are "similarly situated" to one another.  The second and third assertions constitute similarities only if articulated at a high level of generality.  In fact, the disciplinary incidents in Owings' past are either less serious than Philpot's insofar as they did not result in dismissal, or, in the case of certain other "unreported incidents" alleged by Philpot, involved minor disagreements with other employees that never required interference from Amtrak police or supervisors and were never recorded in Owings' employee file.  Id. at 1:30-5:00.  Likewise, Philpot's and Owings' respective actions on August 14, 2008 were not of the same character—for example, Owings did not refuse to comply with police orders.

After oral argument, Philpot's counsel was provided with yet another opportunity to submit supplemental case law supporting Philpot's view that he and Owings were "similarly situated."  In her supplemental letter, Philpot's counsel failed to cite any cases that cast Philpot's contentions on this issue in a more favorable light.  See Philpot's Letter of October 28, 2011.  In sum, the Court is persuaded that Philpot and Owings were not "similarly situated" employees and

that Philpot has failed to make out a prima facie case of racial discrimination. See, e.g., Moussa v. Penn. Dep't of Pub. Welfare, 413 Fed. App'x 484, 487 (3d Cir. 2011) (holding that a physician terminated for sexually harassing his co-workers was not similarly situated to two other employees whose sexual misconduct had been less egregious).

Moreover, even assuming arguendo that Philpot has established a prima facie case, he fails to raise a genuine dispute of material fact regarding Amtrak's assertion that it terminated him for legitimate, non-discriminatory reasons. To repeat the undisputed evidence once more: (1) Philpot refused to follow Officer Arntz's order to move his car, even after Owings had driven away the vehicle that Philpot asserts was obstructing his driving path; (2) Philpot moved toward Officer Arntz and invaded his physical space after Officer Arntz instructed Philpot to move away; and (3) Philpot refused to comply with multiple requests by Amtrak Police to produce his driver's license. These events were described by Officer Arntz to Gadbois, who also personally observed Philpot acting in a defiant and angry manner towards police. Furthermore, Philpot admits that at the time these events took place, he was employed pursuant to a "last chance" agreement with Amtrak. This evidence provides abundant support for Amtrak's stated reasons for Philpot's dismissal, which Philpot has not adequately rebutted or contradicted with evidence of other possible motivations.

Indeed, Philpot expressly admits that he has provided no evidence in the record, or even specific statements of belief, that O'Connell, Alleman, Oratokhai, or the members of the Special Board of Adjustment harbored a discriminatory or retaliatory motive in rendering their adverse

employment decisions against him.[9]  Def. MUF and Pl. MUF at ¶¶ 95-101.  Thus, at best, Philpot is left with the claim that Gadbois, who this Court assumes for the sake of argument had influence or decision-making authority over Philpot's dismissal, acted with a discriminatory intent.  With respect to Gadbois, however, Philpot is simply unable to assert anything but unsubstantiated suspicions.

Philpot supports his claim that Gadbois acted pretextually by relying principally upon the following: (1) Exh. E of Pl. Br at 32:21-24, reflecting that Gadbois had agreed with Amtrak's previous decision to dismiss Philpot from employment in October 2005; and (2) Exh. K of Pl. Br. and Exh. B of Pl. Br. at 151:6-7, reflecting that during the course of events on August 14, 2008, Gadbois observed Philpot accusing Amtrak police and supervisors of being racist, and responded by telling Philpot that racial comments were not allowed on Amtrak property.  This evidence is not adequate to permit a reasonable fact-finder to "disbelieve the employer's articulated

---

[9] Philpot's response to Amtrak's Motion for Summary Judgment expressly indicates that the following facts are "undisputed":

> Nowhere in the record does Philpot provide any evidence or even specific statements of belief that Mr. O'Connell harbored any discriminatory or retaliatory motive against Philpot that formed the basis of the determination of Philpot's guilt.  Def. MUF and Pl. MUF at ¶ 95.
>
> Nowhere in the record does Philpot provide any evidence or even specific statements of belief that Mr. Alleman harbored any discriminatory or retaliatory motive against Philpot that formed the basis of the [sic] Philpot's dismissal from employment.  Id. at ¶ 97.
>
> Nowhere in the record does Philpot provide any evidence or even specific statements of belief that Ms. Oratokhai harbored any discriminatory or retaliatory motive against Philpot that formed the basis of her denial of Philpot's appeal and affirmance of the guilty determination and disciplinary assessment.  Id. at ¶ 99.
>
> Nowhere in the record does Philpot provide any evidence or even specific statements of belief that Messrs. Zusman, Woodcock or O'Connell [i.e., the members of the Special Board of Adjustment] harbored any discriminatory or retaliatory motive against Philpot that formed the basis of their denial of Philpot's second-step appeal and affirmance of the guilty determination and disciplinary assessment.  Id. at ¶ 101.

legitimate reasons or [ ] believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994); accord Klina v. SEPTA, 2011 WL 4572064, at *10 (E.D. Pa. Oct. 3, 2011).[10]

Rather, the relevant evidence reflects that Gadbois' actions were prompted by good-faith reliance on police observations of Philpot's misconduct, by Gadbois' own observations of that misconduct, and by Gadbois' knowledge of Philpot's past disciplinary problems. Philpot must show that those particular criteria for his dismissal were "obviously weak or implausible," which he has failed to do in his responsive brief, at oral argument, or in his supplemental letter brief. Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992) (internal quotation marks omitted); see also Klina, 2011 WL 4572064, at *11-12 (holding that evidence that plaintiff had met or exceeded expectations in certain employment criteria, without more, did not demonstrate pretext where the employer had justified its actions based on other criteria). Certainly, the mere fact that Philpot "disagrees with [his] employer's evaluation of hi[s] [actions in 2005] does not prove pretext," Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir. 1991), overruled on other grounds, St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); nor is the fact that Philpot himself introduced racial comments into the conversations that took place on August 14, 2008 illustrative of racial animus by Gadbois. Accordingly, Amtrak is entitled to judgment as a matter of law with respect to Philpot's claims of race discrimination under Title VII and the PHRA.

---

[10] To the extent Philpot also attempts to show pretext by disclosing that the disorderly conduct charge was "withdrawn at trial, presumably due to lack of evidence," Pl. MUF ¶ 39, his argument is without merit. See note 6, supra.

**B. Unlawful Retaliation in Violation of Title VII and the PHRA**

As with a claim of race discrimination under Title VII and the PHRA, a plaintiff bears the initial burden of establishing a prima facie case of unlawful retaliation.  See McKenna v. City of Philadelphia, 649 F.3d 171, 178 n.7 (3d Cir. 2011) (discussing application of McDonnell Douglas to a Title VII retaliation claim); Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007) (discussing application of McDonnell Douglas to a PHRA retaliation claim).  In particular, Philpot must show that: (1) he was engaged in a protected activity; (2) he suffered an adverse employment action after or contemporaneous with his protected activity; and (3) there is a causal link between his protected activity and the adverse employment action.  Marra, 497 F.3d at 300.

Philpot asserts that he was dismissed in August 2008 in retaliation for a claim of race discrimination he made after his prior termination in October 2005.[11]  Pl. Br. at Part III.C.1.  Amtrak concedes that Philpot "asserted a prior claim of discrimination"[12] in connection with his October 2005 termination and suffered an adverse employment action approximately three years after that activity.  Def. Br. at 9-10.  Amtrak argued in its responsive brief and at oral argument, however, that Philpot is unable to make out a prima facie case under this theory because he

---

[11] Philpot asserted a second theory of retaliation in his Complaint—namely, that he was dismissed in August 2008 in retaliation for statements he made on August 14, 2008 accusing Amtrak police and supervisors of racism.  Compl. ¶ 24.  Notably, however, Philpot did not substantively discuss this claim in his response to Amtrak's Motion for Summary Judgment.  At oral argument on September 26, 2011, the Court asked Philpot's counsel whether the absence of a response regarding the second theory of retaliation reflected a decision to abandon the claim.  Philpot's counsel answered in the affirmative.  See Audio File, Courtroom_3A_10-26-2011, at 18:00-19:00.  Accordingly, the claim has been abandoned and the Court need not address it in further detail here.

[12] As discussed in note 5, supra, neither party provides citations to the record that shed light on the specific nature of this past discrimination claim.  The only relevant citations to the record involve an ambiguous portion of Philpot's deposition testimony, see Exh. A of Def. Br. at 8:25-12:14.  However, in light of Amtrak's concession that Philpot had, in fact, lodged a past claim of discrimination and in light of its challenge to Philpot's prima facie case on other grounds, this Court need not decide the question of whether Philpot's past activity constituted "protected activity" within the meaning of Title VII and the PHRA.

cannot show the requisite causal link between the protected activity and his subsequent dismissal.

This Court agrees with Amtrak.  The nearly three-year lapse between the protected conduct and the alleged retaliation—especially in light of the fact that Philpot was <u>reinstated</u> as an employee during the intervening period[13]—is inadequate to give rise to a causal link based on temporal proximity.  <u>See</u> <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 503-04 (3d Cir. 1997) (holding that the passage of 19 months between the protected conduct and the alleged retaliation was too long to show causal link under circumstances in which the plaintiff had not provided other evidence of intervening antagonism or retaliatory animus).  Moreover, and as already noted <u>supra</u>, Philpot expressly admits that he has provided no evidence in the record, or even specific statements of belief, that O'Connell, Alleman, Oratokhai, or the members of the Special Board of Adjustment harbored a retaliatory motive against him in rendering their adverse employment decisions.  Def. MUF and Pl. MUF at ¶¶ 95-101.

Once again, Philpot is left merely with a possible claim based on the actions of Gadbois, who this Court will assume <u>arguendo</u> had influence or decision-making authority over Philpot's dismissal.  A causal link between Philpot's protected conduct and Gadbois' adverse action is corroborated, Philpot suggests, by evidence that Gadbois agreed with Amtrak's decision to dismiss Philpot in October 2005, Exh. E of Pl. Br at 32:21-24, and by evidence that Gadbois participated in gathering documentation and evidence about the events on August 14, 2008 in preparation for Amtrak's internal investigation and hearing, Exh. M of Pl. Br.; Exh. E. of Pl. Br. at 101:16-103:20.  When questioned at oral argument about the substantial time lag between

---

[13] The disciplinary records of employees at Amtrak's 30th Street Station reflect that Philpot is one of only two employees since January 1, 2000 to have been reinstated more than once following multiple dismissals. Def. and Pl. MUF ¶ 83; Exh. R of Def. Supp. Br. at ¶¶ 19-20.

Philpot's 2005 race discrimination claim and his August 14, 2008 dismissal, Philpot's counsel responded only that August 14, 2008 was the "first opportunity" available to Gadbois to terminate an employee as exemplary as Philpot.  Audio File, Courtroom_3A_10-26-2011, at 16:30-17:30.

Under the circumstances, the Court cannot but agree with Amtrak.  The record simply does not support the notion that Gadbois was lying in wait for a period of years—and through at least one favorable employment action—looking for the best opportunity to strike at Philpot with a pretextual dismissal.  No reasonable fact-finder could conclude from the evidence cited by Philpot that Amtrak had engaged in "pattern of antagonistic behavior" toward him since 2005, see Woodson v. Scott Paper Co., 109 F.3d 913, 921 n.3 (3d Cir. 1997), or that Amtrak had engaged in any other behavior that might show a causal link between Philpot's 2005 claim of discrimination and his 2008 dismissal.

## VII. Conclusion

For the reasons set forth above, Amtrak's Motion for Summary Judgment is GRANTED with respect to all of Philpot's claims.  An appropriate Order follows.[14]

O:\CIVIL 09-10\10-1276 Philpot v. Amtrak\Philpot SJ Memo.wpd

---

[14] As stated in Part II, supra, the Court also GRANTS Philpot's Motion for Leave to Substitute Plaintiff's Response to Defendant's Motion for Summary Judgment to Include Exhibits.  The substituted brief filed with that Motion will be treated as a timely response to Amtrak's Motion for Summary Judgment.